498 P.2d 594

The HOME INSURANCE COMPANY,
a corporation, Appellant,

v.

Terry Lynn LOMAX, a single male,
et al., Appellees.

No. I CA–CIV 1567.

Court of Appeals of Arizona,
Division 1.

June 29, 1972.

Rehearing Denied Aug. 7, 1972.

Jennings, Strouss & Salmon, by Rex E. Lee and Wm. R. Jones, Jr., Phoenix, for appellant.

Brewer & Mallamo, by Charles M. Brewer, and Herbert Mallamo, Phoenix, for appellees Runge.

Hill & Savoy, by John E. Savoy, Phoenix, for appellee Lomax.

HATHAWAY, Judge.

Appellant, The Home Insurance Company, issued a "business owner's policy" to the insured, Mecham Pontiac Corporation. Appellee, Terry Lynn Lomax, picked up a 1968 "Firebird" Pontiac automobile from the insured on or about March 4, 1969, and two days later while operating the vehicle, he severely injured appellee, Edward L. Runge.

This appeal is from a declaratory judgment in favor of appellees entered upon findings of fact and conclusions of law.

Two questions are presented for review. First, was Terry Lynn Lomax a "permissive user" of a Mecham Pontiac automobile, or was he one to whom possession of an automobile had been "transferred . . . by the named insured pursuant to an agreement of sale?" If Lomax falls into the latter category, then coverage is excluded by the specific policy terms. If coverage is not excluded we must answer the second question, to wit: Was there a valid policy endorsement limiting coverage for permissive users to the amounts specified by the Arizona Uniform Motor Vehicle Safety Responsibility Act, A.R.S. § 28–1101, as amended, et seq? We will consider the questions in the order they have been set forth.

The parties agree that if Lomax is covered as a "person insured", it must be under subparagraph IV(3) (a) of the policy, which provides:

"(3) with respect to the automobile hazard:

(a) any person while using, *with the permission of the named insured,* any automobile to which the insurance ap-

plies under the automobile hazard, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission. . . . (Emphasis added)

Appellant's position is that the following language in paragraph IV specifically excludes Lomax:

"None of the following is an insured:

(iii) any person or organization, other than the named insured, with respect to any automobile

* * *

(b) possession of which has been transferred to another by the named insured pursuant to an agreement of sale;"

Crucial to the coverage question is the nature of Lomax's possession of the Firebird. The principal point of disagreement centers on whether Lomax entered into an agreement of sale with appellant; we will therefore first address that point.

Terry Lynn Lomax, 22 years old, was employed by A. J. Bayless as a truck-loader at a gross salary of $499 per month when he appeared on March 4, 1969, at Mecham Pontiac. He owned a 1963 Chevrolet Impala which was encumbered by a lien to the First National Bank of Arizona in the amount of $888.43. Mecham Pontiac appraised the Impala at $555. The total cash price for the Firebird amounted to $3,377.71 which included sales taxes, title and license fees.

The evidence is indisputed that Mecham Pontiac knew that Lomax had no equity in the 1963 Impala to be traded in and that he would have to secure an additional $300 as a downpayment. It is likewise undisputed that Mecham Pontiac knew the balance of the purchase price—$3,077.71— was to be financed. Mecham's credit manager secured a credit application from Lomax and undertook to place the financing with the Pioneer Bank. A "Retail Buyer's Order" was obtained from Lomax with his signature affixed thereto, and an "application for Arizona certificate of title and registration" executed in blank, was retained by Mecham.

The "Retail Buyer's Order", upon which the appellant relies as an agreement for sale and thus a basis for the transfer of possession, provides in bold print:

"THIS ORDER IS NOT BINDING UNTIL ACCEPTED BY DEALER AND PURCHASER'S CREDIT HAS BEEN APPROVED BY THE FINANCE COMPANY."

The trial court found that the "Retail Buyer's Order" was not a binding agreement of sale and entered the following pertinent findings:

"6. That on or about the 4th day of March, 1969, Mecham Pontiac permitted Lomax possession of their used 1968 Pontiac Firebird bearing Mecham's dealer plates #3179, and at that time Lomax signed a Retail Buyer's Order which was not binding on either the purchaser or seller; that said permission extended until March 7, 1969, at which time the proposed co-signer, Gary Rolf, was to grant approval or render his disapproval as to the purchase of said car and also on March 7, 1969 to render his decision to allow or not allow his credit to be used for the purchase of said car through his bank, to wit, the First National Bank of Arizona.

7. That at no time did the co-signer, Gary Rolf, sign any agreements to purchase or finance or make any application for credit to co-sign for said Mecham Firebird automobile, nor did he approve Lomax's purchase of the Firebird automobile, nor did he request financing from his bank, the First National Bank of Arizona.

8. That Mecham Pontiac owned the said Pontiac Firebird on March 6, 1969, when it was involved in an accident with Defendant Runge, which accident resulted in severe injuries to Runge, including but not limited to the amputation of his left leg, and at the time of said accident Defendant Lomax was still a permissive

user and was covered under the policy of insurance for the accident in question and resulting injuries to Defendant Runge as a permissive user, with limits of $100,000/$300,000 as and for bodily injury liability."

The record supports the trial court's findings. The "Retail Buyer's Order" amounted to nothing more than a conditional offer which might have ripened into a firm offer upon Lomax's securing adequate financing. See Cavazos v. Holmes Tuttle Broadway Ford, Inc., 104 Ariz. 540, 456 P.2d 910 (1969); Miller v. Haley, 38 Ariz. 469, 300 P. 1020 (1931). Lomax made no agreement or promise in the offer to pay the sales price to Mecham Pontiac. Before there can be a conditional sales contract there must be a binding, absolute obligation on the part of the buyer to pay the full amount of the purchase price. Automatic Voting Machine Corp. v. Maricopa County, 50 Ariz. 211, 70 P.2d 447 (1937); Oberan v. Western Machinery Co., 65 Ariz. 103, 174 P.2d 745 (1946). Even if a promise to pay could be implied from the language of the purchase order, it would fail as a conditional sales agreement since no specific terms for the sale were agreed upon. See Byrd v. Kidd, 92 Ariz. 337, 376 P.2d 863 (1962).

Appellant, citing Beatty v. Western Pacific Ins. Co., 74 Wash.2d 530, 445 P.2d 325 (1968), contends that Lomax and Mecham Pontiac intended to effect a conditional sale. We find that the following facts clearly show that Lomax and Mecham had no such intention: The "Firebird" carried Mecham's dealer's license plates, no temporary plates or registration having been issued to Lomax; Lomax did not deliver title to his Impala and the "Firebird" was still registered in the previous owner's name since Mecham had made no attempt to transfer title; further, appellant paid Mecham Pontiac for repairs to the auto stemming from the accident, albeit

without expressly admitting that the loss was covered by its policy issued to Mecham.[1] In addition, no money was exchanged pursuant to the alleged contract. Lomax gave Mecham Pontiac his check in the sum of $25 in conjunction with the execution of the Retail Buyer's Order. No credit was given on the order for the check, rather it is reflected thereon as payment for a "warranty charge." The trial court's undisputed finding was that the check was:

"for the purpose of holding the 'Firebird' until a sale could be consummated, otherwise it was to be returned to Lomax if the prospective co-signer Gary Rolf would not give his approval on March 7, 1969."

Nor are we persuaded by appellant's argument that Lomax would have left the "Firebird" at the lot on March 5th if it had not been transferred "pursuant to an agreement of sale." Testimony indicated that Lomax asked the Mecham salesman, with whom he had been dealing, if he could take the car to work in order to allow the prospective co-signer to examine the mechanical soundness of the automobile before giving his approval. The salesman assented, and the trial court made a finding of fact to this effect.

It is clear from the record that no conditional sale was intended nor agreement entered into by the parties. Mecham Pontiac did not lose the right to give or withhold its consent to the use and possession of the "Firebird", and its retention of the title was for something other than a security device which is the earmark of the conditional sale. We agree with the trial court and hold that Lomax was a "permissive user" of the "Firebird" and covered by appellant's insurance policy issued to Mecham Pontiac at the time of the accident on March 5, 1971.

The second question requires interpretation of an alleged endorsement purporting

---

1. See A.R.S. § 20–451 (Supp. 1971–72) prohibiting an insurer, its agents or employees from paying out losses "not specified in the policy of insurance . . . ."

524

to limit the coverage of the basic policy to the limits prescribed by the Arizona Safety Responsibility Act (A.R.S. §§ 28-1101 to 1225). The endorsement in part provides:

"2. Paragraph 1, (a), (b) and (c) of 'Limits of Liability' under Part 1 is made subject to the following provision:

'Provided that with respect to a person described as insured under paragraph (3) (b) of Persons Insured and any person or organization legally responsible for the use of the automobile by such person, other than the named insured and any person or organization described in paragraph (3) (a) of Persons Insured,

(i) the applicable limit of the company's liability shall be the amount by which (1) the applicable minimum limit of liability for bodily injury or property damage specified in the financial responsibility law of the state in which the automobile is principally garaged exceeds (2) the sum of the applicable limits of liability under all other valid and collectible insurance available to the insured, and

(iii) the insurance under this policy shall not apply to any loss with respect to which the insured has other valid and collectible insurance unless the total amount of the loss exceeds the sum of the limits of liability of all other policies affording such other insurance and the company shall then be liable, subject to clause (i) foregoing, only for the excess.' "

The endorsement seems to have been intended to limit the liability under the basic policy and standing alone might have such an effect. However, other than the heading, the endorsement does not refer to the policy limits in the policy before us, since it refers to Paragraph 1(a), (b) and (c) of Limits of Liability under Part I, which do not exist in the "Limits of Liability" portion of the policy to which appellant attempts to relate the endorsement.

Further, the endorsement is made "subject to exceptions . . . as set forth in the policy." We find no such

exceptions and it appears that the endorsement was drafted for use with a policy not before this court. As appellees correctly point out, any interpretation by this court of the nature and extent of liability under the endorsement "must depend upon the exercise of speculation, surmise and conjecture." We will not re-write the policy or the endorsement to accomplish what appellant asks. The trial court, also, properly refused to do so.

All of the policy, including the endorsement, must be read as a whole to determine the intention of the parties. Reserve Ins. Co. v. Staats, 9 Ariz.App. 410, 453 P.2d 239 (1969). In case ambiguity or doubt arises respecting the contract coverage or terms, it will be construed against the insurer and in favor of the insured. Paulin v. Fireman's Fund Ins. Co., 1 Ariz. App. 408, 403 P.2d 555 (1965). In Porter v. Empire Fire and Marine Ins. Co., 106 Ariz. 274, 279, 475 P.2d 258, 263 (1970), the Arizona Supreme Court citing with approval Continental Casualty Co. v. Phoenix Constr. Co., 46 Cal.2d 423, 296 P.2d 801 (1956), stated as follows:

"[T]he declared legislative and judicial policy of this state is to give monetary protection to those who lawfully using the highways, suffer injury through negligent use of the highways by others . . . ."

The California Supreme Court in Continental Casualty, *supra*, set forth the general rules relating to construction of ambiguous insurance contracts:

"It is elementary in insurance law that any ambiguity or uncertainty in an insurance policy is to be resolved against the insurer. If semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates. If the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact of coverage, whether as to peril insured against . . . or the person

or persons protected, the language will be understood in its most inclusive sense, for the benefit of the insured." (Citations omitted) Id. 296 P.2d at 809–810.

There is no conflict between the policy and the endorsement, rather the endorsement itself creates the ambiguity by making it impossible to determine from the whole contract whether the parties intended one in Lomax's position to be included within the policy, the endorsement or the exceptions to the endorsement.

The judgment is affirmed.

KRUCKER, C. J., and HOWARD, J., concur.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120, subsec. E.