**RCA CORPORATION, Appellant,**

v.

**STATE TAX COMMISSION OF MIS-
SOURI et al., Respondents.**

Nos. 58150, 58151.

Supreme Court of Missouri,
Division No. 2.

Sept. 9, 1974.

Lawrence M. Berkowitz, Kansas City, for appellant; Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, of counsel.

James F. McHenry, Cole County Pros. Atty., and James C. Swearengen, Asst. Pros. Atty., Jefferson City, for respondent.

HOUSER, Commissioner.

These are two appeals from judgments holding RCA Corporation liable to pay *ad valorem* personal property taxes on electronic data processing equipment used by the Department of Revenue and Division of Welfare of the State of Missouri under printed agreements captioned "Equipment Lease and Service Agreement." In Case No. 58,151 RCA sued the Collector of Cole County to recover $40,499.11, the amount of 1970 taxes allegedly wrongfully as-

sessed, and paid under protest. In Case No. 58,150 RCA sued the State Tax Commission, the Assessor and Collector of Cole County, under the Administrative Review Act, to review the proceedings and order of the commission affirming the assessment of the equipment as taxable property of RCA and fixing its assessed value for the year 1971 at $1,006,623. RCA lost and appealed both cases, which were consolidated for argument since they involve a common question. This Court has jurisdiction since these appeals involve a construction of the revenue laws of the state.

The pertinent tax statute, § 137.075, RSMo 1969, V.A.M.S., provides:

"Every person owning or holding * * * tangible personal property on the first day of January * * * shall be liable for taxes thereon during the same calendar year."

· The ultimate question for decision is whether under the equipment lease and service agreements between RCA and these two state agencies RCA is the "owner" of the equipment, liable as such for the payment of ad valorem personal property taxes thereon, or whether RCA has nothing more than a nontaxable security interest therein.

Both agreements provide that RCA "agrees to lease to the Customer" the described equipment and provide specified maintenance upon certain terms and conditions, and that the agreements shall remain in force for seven years "except for the Customer's right to cancel after one year's use of the equipment on any anniversary, upon at least 60 days' prior written notice to RCA." No provision is made for cancellation by RCA. For the unrestricted use of the equipment annual payments of $376,369 are required to be made by the

revenue department; $104,820 by the welfare division, except that, "[s]hould the effective annual period overlap fiscal periods, that portion beyond the current fiscal period shall be subject to the appropriation of funds."[1]

· Paragraph 3 of each agreement, designated "Option to Purchase," gives the agency the option to purchase the equipment on any annual anniversary date, by giving RCA written notice before that date, "upon payment of amounts due on that date, plus any arrearages and the 'Cost to Purchase' amount applicable to that payment date," as follows:

| Payment Number | Allowance for Purchase Option | Cost to Purchase |
|---|---|---|
| | Department of Revenue | |
| 1 | $ 287,843 | $1,727,057 |
| 2 | 575,686 | 1,439,214 |
| 3 | 863,529 | 1,151,371 |
| 4 | 1,151,372 | 863,528 |
| 5 | 1,439,215 | 575,685 |
| 6 | 1,727,058 | 287,842 |
| 7 | 2,014,900 | − |
| | Division of Welfare | |
| 1 | 74,206 | 445,234 |
| 2 | 148,412 | 371,028 |
| 3 | 222,618 | 296,822 |
| 4 | 296,824 | 222,616 |
| 5 | 371,030 | 148,410 |
| 6 | 445,236 | 74,204 |
| 7 | 519,440 | − |

Paragraph 3 also provides: "Title to the equipment shall remain with RCA until the Option to Purchase is exercised and all amounts due have been fully paid, and thereupon title to equipment shall pass to the Customer without further action on the part of RCA. Risk of loss or damage to the equipment shall pass to the Customer with title. If desired, this option need not be exercised and title will remain with RCA." Paragraph 5, denominated "Taxes," provides: "There shall be added to the

1. Apparently this latter provision, and the provision for the agencies' right to cancel, were included to comply with Art. 4, § 23, Constitution of Missouri, 1945, V.A.M.S., limiting the power of the general assembly to make appropriations for one or two fiscal

years, and § 33.065, RSMo 1969, V.A.M.S., providing that "No appropriation shall confer authority to incur an obligation after the termination of the fiscal period to which it relates * * *."

charges provided for in this Agreement amounts equal to any taxes, however designated, levied or based, on such charges or upon this Agreement or the equipment or any parts thereof or repair or replacement thereto or service rendered in connection with any of the foregoing, or the use of any of the foregoing, or any taxes or amounts in lieu thereof paid or payable by RCA in respect of the foregoing, exclusive of ordinary personal property taxes assessed against or payable by RCA and taxes based upon net income." Paragraph 7 of the agreement with the division of welfare, titled "Insurance," provides: "The Customer shall be relieved of all responsibility for any loss or damage from any external cause as respects the property covered by this Agreement."

RCA's tax manager testified at the commission hearing as follows: RCA has four forms of contracts whereby a customer may acquire use of its computers: outright sale, conditional sales agreements, commercial leases, and equipment lease and service agreements of which the agreements in question are examples. The latter are available only to governmental agencies and not to private commercial customers. They are "handmade," that is, designed especially for certain governmental agencies and are frequently referred to as "state and local contracts." State and local contracts are treated as sales by RCA on its own books for federal and state tax purposes, and when consummated the cost of the equipment is written off. Under RCA's normal commercial lease, equipment is shown on RCA's books as "leased," not "sold," and the cost of the leased equipment is capitalized, shown on the books as a fiscal asset, and depreciated. Customers pay approximately 30% more under a commercial lease than under a state and local contract because the rentals under commercial leases include tax payments to be made by RCA. RCA's installment loan contracts also include costs and taxes not included in state and local contracts. In the latter the price is figured on the selling price of the equipment plus interest, but does not include taxes.

Appellant, pointing out that the property is in the possession and under the control of the state agencies, argues that RCA's property interest in the equipment is only a *security interest;* that RCA's object is to secure payment of what is owed RCA under the agreements; that the nature of RCA's interest in the property under the agreements is defeasible title held for security purposes, and not a taxable interest under the personal property laws; that defeasible title to personal property held to secure the purchase price is taxable to the buyer and not to the seller in conditional sales contracts, under Municipal Acceptance Corporation v. Canole, 342 Mo. 1170, 119 S.W.2d 820 (banc 1938), and that by analogy RCA's interest under these agreements, title having been retained solely for purposes of security, should be treated for tax purposes the same as that of a conditional seller. The Court in Canole reasoned that the value of property consists in its use; that whoever owns the use is the true owner of the property for the time being, even though it is on a condition subsequent; that in *ad valorem* taxation values are the ultimate objects of taxation, and "they to whom the values belong should pay the taxes." Citing Kolb v. Golden Rule Baking Co., 222 Mo.App. 1068, 9 S.W.2d 840 (1928), and Vette v. J. S. Merrell Drug Co., 137 Mo.App. 229, 117 S.W. 666 (1909), RCA urges that whether a contract is a true lease or a contract for security purposes depends upon the substance and not the form of a transaction; quotes the following excerpts from the Uniform Commercial Code, and stresses the passage underscored:

§ 400.1–201(37): "'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer * * * is limited in effect to a reservation of a 'security interest'.

\* \* \* Unless a lease \* \* \* is intended as security, reservation of title thereunder is not a 'security interest' \* \* \*. Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) *an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.*"

§ 400.9–102(2): "This article applies to security interests created by contract including \* \* \* title retention contract and lease \* \* \* intended as security \* \* \* ."

Respondents assert that RCA's interest under the agreements is absolute title, taxable under the personal property tax laws; that the agreements are lease agreements; that the inclusion of an option to purchase clause in a lease agreement does not necessarily or absolutely transform a lease into a security agreement under § 400.1–201(37), because under § 400.1–102(3), RSMo 1969, V.A.M.S., the effect of the provisions of the Uniform Commercial Code may be varied by agreement; that the agreements themselves do not refer to security; that the agency's cancellation privilege on any anniversary date and the variance of the option to purchase provision indicate pure lease, as does the language reserving in RCA title and risk of loss and damage to the equipment.

■ While in form the agreements are leases "[t]he real character of the instrument[s] is not determined from [their] technical form, but from the intention of the parties as gathered from the four corners of the contract[s]." Kolb v. Golden Rule Baking Co., supra, 9 S.W.2d l.c. 842[1]. "Whether a lease is intended as security is to be determined by the facts of each case." § 400.1–201(37), RSMo 1969, V.A.M.S. We must gather the intention of the parties from the entire instrument without regard to its form, or technical terms used therein, Kolb, supra, in the light of the nature of the transactions, the situation and relationship of the parties, and the purposes sought to be achieved by them.

These rules do not preclude our noticing that the language of the instruments is "lease language," not "sale language." There is no language affirmatively indicating that they were intended as security devices. Title is expressly reserved in RCA until exercise of the option to purchase, following payment in full of all amounts due. Risk of loss or damage to the equipment passes to the state agency with title but prior to passage of title is in RCA. The department of revenue is relieved of any obligation to carry insurance on the property. Liability for payment for use of the equipment is provided for on an annual basis, for seven years, in annual stops. The agency has the exclusive right to cancel the agreement on any anniversary date after one year's use. The agreement, therefore, runs for one year at a time and may be terminated by the agency at any annual stop. *There is no absolute obligation on the agency to purchase, pay for, or assume title to the equipment at any time prior to exercise of the option to purchase. Whether that ever happens is entirely optional with the agency.* RCA's tax manager asserted that the annual payments effect a buildup of an equity in the agency but we find nothing in the agreements authorizing that conclusion. There is no evidence comparing the annual payments with the fair rental value of the equipment; no evidence that the annual payments exceed the fair rental value. There was evidence that the annual payments include an interest factor, but no evidence as to the amount of interest included.

From the paragraph listing the types of taxes for which RCA is to be reimbursed by the agency it is clear that the parties contemplated assessment of personal prop-

erty taxes against RCA but, significantly, no provision is made for reimbursement of personal property taxes paid by RCA. RCA paid ad valorem personal property taxes on this equipment for the years 1967, 1968 and 1969 without objection, based upon a formula of forty times monthly charge divided by three. RCA paid the assessed taxes for 1970 (under protest). RCA filed a tax return on the equipment for 1971 and would have accepted an assessment of $611,000 on the basis that this amount represented the then-remaining or untransferred equity owned by RCA, but was unwilling to accept an assessment of $1,006,623. This litigation resulted from that difference of opinion. On this appeal RCA takes the position that it owns nothing and therefore owes nothing.

There is no evidence that RCA treated the agreements as security transactions under Article 9 of the Uniform Commercial Code by filing a financing statement under § 400.9–401 et seq. The tax manager of RCA testified that "you don't do that with the state"; that the state is "a blue-chip customer." This is an indication that RCA did not draft these forms for security reasons; that they had no security problem; no particular need to take precautions to insure future payments by the agencies, because behind their promises to pay for the use of the equipment stood the solvent, sovereign State of Missouri. RCA's tax expert also testified that as a manufacturer RCA writes off this equipment after six years; that after six years the equipment has zero value to RCA. If at the end of six years RCA would realize all it expected to gain from these agreements and the equipment would then be worthless to it there would be no reason for RCA to resort to a security device to guarantee its return.

■ These transactions are not conditional sales, and should not be treated as such under the Canole case, supra, because neither agency has assumed an absolute obligation to purchase or pay the purchase price for the equipment. The tests by which a court determines whether a transaction is a conditional sale or a lease are stated in Kolb, supra, 9 S.W.2d l.c. 842[3]: if the transferee is obligated and bound to pay the purchase price it is a conditional sale, but if the agreement requires or permits the transferee to return the property in lieu of paying the purchase price the instrument will be held a lease. In a conditional sale "the purchaser undertakes an absolute obligation to pay for the property." Globe Securities Co. v. Gardner Motor Co., 337 Mo. 177, 85 S.W.2d 561, 567 (1935); 8 Am.Jur.2d Bailments § 28, p. 934; Annos.: 17 A.L.R. 1434, 1435; 43 A.L.R. 1257; 92 A.L.R. 321; 175 A.L.R. 1382. "There can be no sale at all without an agreement, express or implied, to pay. The purchaser's promise to pay is always absolute, otherwise there is no sale, but only an option." McArthur Bros. Merc. Co. v. Hagihara, 22 Ariz. 100, 194 P. 336, 338 (1921); Equilease Corp. v. Donahue, 10 Ohio St.2d 81, 226 N.E.2d 721 (1967). "Before there can be a conditional sales contract there must be a binding, absolute obligation on the part of the buyer to pay the full amount of the purchase price." Home Ins. Co. v. Lomax, 17 Ariz.App. 520, 498 P.2d 594, 597[2] (1972). In the Canole case, on which RCA places its chief reliance, there was an obligation on the part of the municipality to pay for the equipment out of the "savings" to be effected by its use, but in neither agreement in the case before us does the agency unconditionally agree to pay the full purchase price of the equipment, as rentals or otherwise. The obligation is to make the annual payments for the use of the equipment, starting when the equipment is installed ready for use, with payments annually on that date, until and unless the agency cancels the agreement, or exercised its option to purchase, but otherwise RCA cannot compel the agency to make payment of the full purchase price. The agreements are not conditional sales but are rentals of the use of the equipment with an option to purchase, in which RCA is the owner of

the legal and equitable title until by due and proper exercise of the option to purchase title passes to the agency. In an analogous situation this language, peculiarly appropriate here, was used by the Supreme Court of Arizona: "In the rental contract there was no obligation on the part of the lessee to pay beyond the rental period for which he might choose to keep the machine. If he elected to return it at the end of one month it was his privilege to do so. His only obligation was to pay for that month's rent. The lessor could at no time insist that the lessee pay the entire price of the machine because there was no promise by the lessee to do so. Unless an obligation was created on the part of the so-called purchaser to pay, there could not be a conditional sales contract." Oberan v. Western Machinery Co., 65 Ariz. 103, 174 P.2d 745, 748[4] (1946).

■ These transactions should not be treated as security transactions on the basis of the above-underscored portion of § 400.1–201(37). That provision does not necessarily make the leases security instruments as a matter of law. While in the case of an actual security interest the underscored portion applies and doubtless governs, in the absence of a different agreement, parties have freedom to contract in this area and by contract may vary the provisions of the Uniform Commercial Code, including this provision. That right is specifically reserved by § 400.1–102(3), RSMo 1969, V.A.M.S., as long as an agreement does not impinge upon the exceptions noted in that section. By the very definition of "security interest" in the first sentence of § 400.1–201(37) [2] it is clear that these transactions are not security transactions, for the reason above discussed, i.e., that there was no obligation to take title to the equipment and pay for it.

Summarizing, the transactions evidenced by these agreements constitute leases with an option to purchase. They are not conditional sales or the equivalent of conditional sales. They are not security transactions. After the execution of these agreements, there being no exercise of the option to purchase, RCA continued to be the "owner" of the equipment for the purpose of ad valorem personal property taxation under § 137.075. "Where the [plaintiff], by [its] own showing, [has] placed and left the title to the property, the court will leave it, for the purpose of the assessment, levy, and collection of taxes." State ex rel. Glenn v. Mississippi River Bridge Co., 134 Mo. 321, 35 S.W. 592, 595 (1896). There being no special agreement that personal property taxes assessed to or paid by RCA be added to the charges RCA may not recover the taxes paid, nor is the assessment by the tax commission to be invalidated on the ground that the agency and not RCA is the owner of the equipment. Automatic Voting Machine Corp. v. Maricopa County, 50 Ariz. 211, 70 P.2d 447 (1937); Hoover Equipment Co. v. Board of Tax Roll Corrections, 436 P.2d 645 (Okl.1967); Oberan v. Western Machinery Co., supra; Home Ins. Co. v. Lomax, supra.

Judgment affirmed in each case.

STOCKARD, C., concurs.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the Court.

HENLEY, P. J., MORGAN, J., and DONNELLY, C. J., concur.

FINCH, J., not sitting.

---

**2.** " 'Security interest' means an interest in personal property or fixtures which secures payment or performance of *an obligation.*" (Our emphasis.)