The defendant, James L. Sharer, appeals from a summary judgment entered in an action based on a lease contract. He raises two issues: (1) whether the value of a repossessed truck at the time of its sale is a material fact that is disputed; and (2) whether the lease agreement provides for late charges of 5% after the agreement is terminated.
A summary judgment is appropriate upon a showing that no genuine issue of material fact exists and that the moving party is entitled to a judgment as a matter of law. Rule 56, A.R.Civ.P. In reviewing a summary judgment, this Court will view the evidence in a light most favorable to the nonmovant and will resolve all reasonable doubts against the movant.Fincher v. Robinson Bros. Lincoln-Mercury, Inc.,583 So.2d 256 (Ala. 1991). The present action was filed in July 1991; therefore, the applicable standard of review is the "substantial evidence rule." See § 12-21-12, Ala. Code 1975. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989). "In determining whether there is substantial evidence to defeat a summary judgment motion, this Court reviews the record in the light most favorable to the non-movant and resolves all reasonable doubts against the movant." Specialty Container Mfg., Inc.v. Rusken Packaging, Inc., 572 So.2d 403, 404 (Ala. 1990).
The record in this case, viewed in the light most favorable to Sharer, the nonmovant, reveals the following facts:
On August 18, 1987, Sharer executed an agreement to lease a specially equipped truck from Creative Leasing, Inc. Sharer leased the truck for use in his business, Sharer Sash and Door. Shortly after the lease was executed, Sharer incorporated Sharer Sash and Door. In April 1990, Sharer was forced out of the business by the other shareholders.
On October 26, 1990, Creative Leasing notified Sharer that he was in default under the lease agreement and that the lease agreement had been terminated and the truck repossessed according to the terms of the agreement. The agreement states:
 "Time is of the essence of this Agreement and in the event that [Sharer] fails to pay in full on the date due any rental payment due hereunder, . . . [Creative Leasing] shall have the right to take immediate possession of the vehicle wherever found, with or without process of law, and to terminate the lease with respect to such vehicle. . . . "
The agreement also provides that upon default by Sharer and termination by Creative Leasing, Sharer is
 "immediately responsible for [1] the payment of all amounts due under the lease agreement through the date of termination, [2] for the loss (if any) resulting from the sale of the vehicle pursuant to the provisions of paragraph 6 hereof entitled 'Termination', . . . [3] for liquidated damages of One Hundred Dollars to compensate Lessor for the inconvenience and expense of the default termination, and, [4] in addition to the above, for any specific damages Lessor may have sustained as a result of Lessee's default including, but not limited to, out of pocket costs of repossession and attorney's fees."
Paragraph 6, "Termination," provides that any loss upon termination is to be determined in the following manner:
 "The . . . loss on any final disposition [of the leased vehicle] shall be the difference between the offer received and the Termination Value of the vehicle, as defined below:
 "a. If the lease is terminated prior to the end of the initial term, the Termination Value shall be [1] the Depreciated Value at the end of the initial term as specified in Lessee's Order, [2] plus *Page 1193 
the product of the Premature Termination Factor [3] times the number of months from the effective date of termination to the end of the initial term, [4] plus the unamortized portion of any annual prepaid license fees, tags, title and applicable taxes paid by the Lessor, and [5] the loss of Lessor's investment tax credit with respect to the motor vehicle(s) which is/are the subject of Lessee's Order."
Creative Leasing notified Sharer that the "highest available cash offer at wholesale" was $3,300.[1] Sharer avers that he told Steve Palmer, a representative of Creative Leasing, that the offer was "ridiculous," because the truck had "a body specially equipped for the handling of millwork" and "was a premium quality vehicle for use in the millwork trade and was worth at least $10,000." According to Sharer, Palmer agreed not to sell the vehicle until Sharer "could do further investigation into the matter." We note that under the terms of the agreement, Sharer had the option to "bear the loss [upon termination] or [to] otherwise arrange the immediate sale of the vehicle in order to obtain the Termination Value of the vehicle" by notifying Creative Leasing in writing within five business days after the termination value is ascertained. Sharer did not notify Creative Leasing that he wished to assume the responsibility of arranging for the sale of the vehicle. He avers that after Palmer agreed to delay the sale of the truck, "[Palmer] faxed a copy of the lease papers to my attorney on November 7, 1990. I [Sharer] heard nothing further from Creative Leasing until I received a letter from [Creative Leasing's attorney] dated December 2, 1990, which demanded that I pay the full amount which they stated to be $14,394.32."
Creative Leasing filed a complaint on July 25, 1991, seeking payment of $10,795.74 plus 13% interest, based upon the lease agreement. Creative Leasing later moved for a summary judgment, setting forth its claim for $13,703.80. The trial court granted Creative Leasing's motion, and Sharer appeals from the resulting judgment.
Sharer argues that "his evidence of value of the collateral truck at the time of its sale clearly raises a dispute of material fact as to the commercial reasonableness of that sale under § 7-9-504, Ala. Code 1975." Section 7-9-504 states, in part, "A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing." However, we note that Article 9 of the U.C.C., codified as §§ 7-9-101 to -507, Ala. Code 1975, applies "to any transaction (regardless of its form) which is intended to create a security interest in personal property." § 7-9-102(1)(a), Ala. Code 1975. "Security interest" is defined as:
 "[A]n interest in personal property or fixtures which secures payment or performance of an obligation. . . . Unless a lease . . . is intended as security, reservation of title thereunder is not a 'security interest'. . . . Whether a lease is intended as security is to be determined by the facts of each case. . . . "
§ 7-1-201(37). This Court has stated:
 " '[W]e must gather the intention of the parties from the entire instrument without regard to its form, or technical terms used therein . . . in the light of the nature of the transactions, the situation and relationship of the parties, and the purposes sought to be achieved by them.' The ultimate determination, therefore, must be a factual one."
Commerce Union Bank v. John Deere Industrial EquipmentCo., 387 So.2d 787, 790 (Ala. 1980) (quoting RCA Corp.v. State Tax Commission, 513 S.W.2d 313 (Mo. 1974)).
However, we note that the interpretation of an unambiguous contract is a question of law. "[W]hen the terms of a contract are unambiguous, the construction of the contract and its legal effect become questions of law for the court, and when appropriate, may be decided by summary judgment." Dill v.Blakeney, *Page 1194 568 So.2d 774, 777-78 (Ala. 1990). Therefore, whether an agreement is a lease or a secured sale agreement is a question of law when the decision is based upon construction of the agreement and not on extrinsic facts. See LMV Leasing, Inc. v. Conlin,805 P.2d 189, 193 (Utah App. 1991).
Neither party addresses the issue of whether this agreement was a lease or was a disguised security interest. Nevertheless, because Sharer raises an issue on appeal concerning the "commercial reasonableness" of the sale of the truck after termination, citing § 7-9-504, we must resolve the question of the intent of the agreement in order to determine if the provisions of Article 9 of the U.C.C., specifically that section codified in this state as § 7-9-504, controls the sale of the repossessed truck. Because there is no extrinsic evidence on this issue in the record before the trial court on Creative Leasing's motion for summary judgment, we look to the terms of the agreement to determine the intent of the parties.
Section 7-1-201(37), defining "security interest," states that reservation of title under a lease agreement, if "intended as security," may create a security interest. The section also states:
 "Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."
(Emphasis added.) Therefore, a lease agreement that includes an option to purchase is not necessarily intended as a security agreement, but it is intended to be a security interest if that option to purchase may be exercised for no additional consideration or for only nominal consideration.
In this agreement, there is no option to purchase; therefore, we must turn to the other terms of the agreement. In determining whether an agreement was a "lease intended as security," the Georgia Court of Appeals held:
 "A 'lease intended as security' is an agreement in which the ultimate intent is a sale. The prime essential distinction between a lease and a conditional sale is that in a lease the lessee never owns the property. 'In the absence of a right or option in the lessee to acquire ownership of the leased property, the transaction is one of lease.' In re Atlanta Times, 259 F. Supp. 820, 827 (N.D.Ga. 1966), affd. sub nom. Sanders v. Nat. Acceptance Co., 383 F.2d 606 (5th Cir. 1967). Nowhere within the 'Installation-Service Agreement' 'can it be construed that the parties contemplated a sale, an option to purchase, or creation of a security interest. . . . Thus, Article 9 [of the U.C.C.] does not apply and the parties' conduct is governed by the terms of the lease. . . .' McGuire v. Assoc. Capital Svcs. Corp., 133 Ga. App. 408, 411, 210 S.E.2d 862 (1974)."
Ford v. Rollins Protective Services Co.,171 Ga. App. 882, 884, 322 S.E.2d 62, 64 (1984).
We hold that in order to be viewed as creating a security interest, the lease agreement must provide the lessee with some ownership of the leased property. In LMV Leasing, Inc. v.Conlin, 805 P.2d 189 (Utah App. 1991), in examining a substantially similar lease agreement, the Utah Court of Appeals held:
 "Despite the presence of several factors [that indicated the lease may have been intended as a security agreement, such as provisions requiring the lessee to provide insurance and to pay taxes as well as repair and maintenance costs, provisions providing for acceleration and resale of the leased vehicles, rental payments roughly equivalent to the cost of the vehicle plus interest, and provisions excluding any warranties of fitness for purpose, merchantability, and quality], other aspects of the agreement demonstrate the clear intention of the parties that the agreement was nevertheless intended *Page 1195 
to be a true lease agreement. Most notably, there is no provision, either explicit or implicit, for transfer of ownership of the vehicles to [the lessee]. 'The prime essential distinction between a lease and a conditional sale is that in a lease the lessee never owns the property.' Ford v. Rollins Protective Serv. Co., 171 Ga. App. 882, 322 S.E.2d 62, 64 (1984) (emphasis added). The agreement specifically provides for retention of title in [the lessor], which is the 'paramount attribute of a lease.' Carlson v. Tandy Computer Leasing, 803 F.2d 391, 395
(8th Cir. 1986). Moreover, the agreement includes no alternative provision for transfer of ownership such as an option to purchase at nominal or no additional consideration. Nor is there any indication that the lessee would receive the functional equivalent of ownership.
 "Additionally, ownership tax benefits under the lease were reserved exclusively to the lessor, another traditional indication that the parties intended to enter a true lease agreement. See, e.g., American Standard Credit, Inc. v. National Cement Co., 643 F.2d 248, 266 (5th Cir. 1981) (holding that lessor's retention of investment tax credit on purportedly leased property manifested intent of parties to enter true lease agreement); Colonial Leasing [Co. v. Larson Bros. Construction Co., 731 P.2d 483, 487 (Utah 1986)].
 "Because we conclude that there is no dispositive indication on the face of the document that the parties intended to execute a security agreement, we defer to the language of the unambiguous instrument. Accord Carlson, 803 F.2d at 395 (intent of parties expressed by consistent use of 'lease language'); American Standard Credit, 643 F.2d at 266 (principle of function over form does not authorize the courts to ignore the terms of an agreement altogether)."
LMV Leasing, 805 P.2d at 196.
In In re Tillery, 571 F.2d 1361 (5th Cir. 1978), the Fifth Circuit Court of Appeals, applying Alabama law and construing an agreement, purporting to be a lease, that was substantially similar to the agreement in LMV Leasing
and to the agreement in this case, held that the "termination formula," which provided that the lessee would bear any loss or receive the benefit of any gain resulting from the sale of the leased vehicle after termination, "recognize[d] the equity of the 'Lessee' " and, therefore, that the agreement was intended for security. The Court of Appeals stated, "An equity in the 'Lessee' is one of the distinctive characteristics of a lease intended for security." However, we must disagree with the holding that such clauses in lease agreements like the one inTillery and the one in this case represent an "equity" of the lessee in the leased vehicle.
Viewed as to its economic function, such a termination clause does not represent an equity in the vehicle, but a shifting of the risk that the actual value of the leased vehicle at the time the lease is terminated — as determined by the actual sale of the leased vehicle or, as in the instant case, by the taking of bids — will be different from the predicted "book value" or "depreciated value," e.g., the cost of the vehicle adjusted by a constant depreciation figure. If the actual value at the time of termination is less than the predicted book value, the lessee must pay the lessor the difference; if the actual value at the time of termination is more than the predicted book value, the lessee receives the benefit of this gain. We do not agree that the resulting loss or gain to the lessee necessarily represents an "equity" in the property.
"Equity" in an item, such as a truck, is generally considered to be the amount or value of property over the indebtedness against it. See Black's Law Dictionary 540 (6th ed. 1990) (citing Dorfman v. Dorfman, 457 S.W.2d 417, 422
(Tex.Civ.App. 1970)). The lessee, under the termination scenario provided by the lease agreement at issue, assumes the risk of loss (or gain) in the event that the vehicle, at the end of the lease, cannot be disposed of at an *Page 1196 
amount equal to its "book value" or "depreciation value." Therefore, it cannot be said that such a shifting of the risk of loss in value of the item alone is sufficient to hold that any lease agreement containing such a clause necessarily was intended to create a security interest.
Based upon the rationale of LMV Leasing, supra, and its interpretation of a substantially similar agreement, we hold that the agreement between Sharer and Creative Leasing is a lease agreement and did not create a security interest. Therefore, the provisions of Article 9 of the U.C.C. do not apply to the agreement and the subsequent sale of the truck, and Sharer's assertion as to the value of the truck is not substantial evidence creating a disputed issue of material fact sufficient to defeat Creative Leasing's motion for summary judgment.
The second issue raised by Sharer is whether the trial court correctly awarded 13% interest on the amount held to be due on termination. Section 8-8-8, Ala. Code 1975, provides, "All contracts, express or implied, for the payment of money, or other thing, or for the performance of any act or duty bear interest from the day such money, or thing, estimating it at its money value, should have been paid, or such act, estimating the compensation therefor in money, performed." The legal interest rate in Alabama on written contracts is 8%. §8-8-1, Ala. Code 1975. Because the termination amount that Creative Leasing claims arises from a breach of the lease agreement and is computed under the clear and unambiguous terms of the lease agreement, we hold that Creative Leasing is entitled to interest, at 8%, on the amount due upon termination.
The more sharply focused issue, therefore, is whether Creative Leasing is entitled to an additional 5% interest under the terms of the contract. As stated supra, "[w]hen the terms of a contract are unambiguous, the construction of the contract and its legal effect become questions of law for the court, and when appropriate, may be decided by summary judgment." Dill, 568 So.2d at 777-78. The terms of this contract are unambiguous and clearly provide that the additional 5% interest that Creative Leasing argues it is entitled to under the terms of the agreement is not "interest," but rather is a "late charge" that may be assessed on monthly rental payments that are "not received within 15 days of the due date."
Paragraph one of the agreement, "Leased Vehicle, Rental Payment and Term," states:
 "Lessee agrees to pay each total monthly rental in advance without deduction, set off or counter claim, on the dates and at the place specified in Lessee's Order. Any payments not received within 15 days of due date shall be subject to a late charge of 5% of the total payment due."
(Emphasis added.) Indeed, Creative Leasing, in its affidavit in support of its summary judgment motion, averred the following: "That the sum of $9,095.44 is due and owing plus interest at the legal rate of 8% and late charges at the rate of 5% permonth beginning October 26, 1990. . . ." (Emphasis supplied.)
Paragraph 10 of the lease agreement, entitled "Default," provides that Creative Leasing, Inc., may terminate the lease agreement for nonpayment of any rental payments. According to the clear terms of paragraph 10, if Creative Leasing chooses to terminate the lease agreement, any rental payments that are unpaid at the time of termination are included in the amount due on termination.
According to the terms of the agreement, as discussed above, when Creative Leasing terminated the lease agreement it was entitled to claim the following items and, according to the record, claimed the following amounts (taken from an affidavit filed by Creative Leasing): *Page 1197 
"Allowable Claims Amount Claimed
"[1] All amounts due under the lease agreement through the date of termination ......... $1,116.86
"[2] The loss (if any) resulting from the sale of the vehicle pursuant to the provisions of paragraph 6, entitled 'Termination'
 "[a] The depreciated value at the end of the initial term $7,400.00
 "[b] The product of the Premature Termination Factor [$546.95] times the number of months from the effective date of termination to the end of the initial term [10 months and 6 days] 5,578.88
 "[c] LESS the proceeds from the sale of the vehicle (5,000.00)
"AMOUNT DUE UNDER ¶ 6 .......... 7,978.88
"TOTAL AMOUNT CLAIMED AS 'DUE FROM LEASE' .......... 9,095.44"
The resulting figure (hereinafter referred to as the "default/termination loss amount") is the amount that Creative Leasing was entitled to upon its termination of the lease agreement due to Sharer's default on any rental payment.[2]
When the lease agreement was terminated, according to the terms of the agreement all amounts due and owing as rental payments were merged with other amounts into the figure we refer to as the default/termination loss amount. Upon termination of the lease agreement, there are no more monthly rental payments. Therefore, as the 5% late fee is unambiguously limited to late "rental payments," the default/termination loss amount, or any part of it that can be traced to rental payments, is not subject to the 5% "late fee."
Therefore, the trial court erred in awarding Creative Leasing an amount equal to 13% prejudgment interest on the default/termination loss amount. The lease agreement is silent as to the interest rate on any default/termination loss amount; therefore, the default-termination loss amount bears only the legal rate of prejudgment interest.
Based on the foregoing discussion, the award of the default-termination loss amount stated in Creative Leasing's affidavit is affirmed; however, we reverse the trial court's award of 13% interest on this amount and remand this case with instructions for the trial court to modify its order so as to award prejudgment interest at the legal rate of 8%.[3]
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, ADAMS, HOUSTON, STEAGALL and KENNEDY, JJ., concur.
[1] The truck actually sold for $5,000 before Creative Leasing moved for a summary judgment. Creative Leasing figured its final claim using the larger figure of $5,000.
[2] The total of the figures in the table is actually $9,095.74. Creative Leasing claimed only $9,095.44; thus, the discrepancy in the totals.
[3] We note that the lease agreement also includes a provision for the payment of attorney fees. Creative Leasing does not claim interest at the legal rate of 8% or at the "late charge" rate of 5% on the amount claimed as its attorney fees. We recognize that Creative Leasing is entitled to its reasonable attorney fees, which it claimed were $3,425.95; however, because it does not include this amount in its total due upon termination as to which it seeks the prejudgment interest, that amount is not included in the total of $9,095.44. *Page 1198