456 P.2d 910

Rosa P. CAVAZOS, Appellant,

v.

HOLMES TUTTLE BROADWAY FORD,
INC., and Al Leon, Appellees.

No. 9607–PR.

Supreme Court of Arizona.

In Banc.

June 30, 1969.

S. Leonard Scheff, Tucson, for appellant.

Boyle, Bilby, Thompson & Shoenhair, by Michael Lacagnina, Tucson, for appellees.

UDALL, Chief Justice:

This case is before us on a petition to review a decision of the Court of Appeals which affirmed a judgment for defendant granted by the Superior Court of Pima County. The opinion of the Court of Appeals reported in 9 Ariz.App. 167, 450 P.2d

133, is vacated, and the case is remanded for hearing on one issue.

Plaintiff-appellant, Rosa Cavazos owned a 1963 Chevrolet and, on March 18, 1967, went to Holmes Tuttle Broadway Ford, Inc. to trade it in on another car. There she met and dealt with defendant's salesman, Al Leon. In a written "Purchaser's Statement" she revealed her financial condition to be very weak. It showed that she worked as a dental assistant for the Pima County Hospital at a salary of $275 per month; that she owed the Pima County Credit Union $480; and that she had no property or other income.

She made it clear to Leon that any car which she selected would have to be financed, and that she intended to obtain the money from the Pima County Credit Union. She testified that Leon told her that financing a new Mustang, after a trade-in of her old car, would require only about $65 per month. Leon admitted that he knew the payments would exceed $100 per month, but denied mentioning the $65.00 figure to her.

After selecting the new car, she asked for papers to take to the credit union for its approval. Leon denies this, but admits that he prepared a "work order", and a conditional sales contract, both of which he had her sign.

The events which followed, resulted from the selling tactics used by the salesman, and the use of a printed form in a transaction for which it was not designed.

Many customers leave the obtaining of their car loans to the dealer from whom they buy their cars. For this reason, defendant had a supply of printed work orders with blank spaces in which the salesman could write the name of the customer, description of the car, price, etc. The form used in this case, mentioned the possibility that the customer might also sign a conditional sales contract. Another printed provision was to the effect that *"Purchaser acknowledges that credit purchase is subject to Finance Company or Bank approval. If rejected, car must be returned to seller on demand."* [Italics ours.] In the blank spaces of the form, the salesman wrote that the purchase price would be paid by "one payment of $2966.05 due March 24, 1967—Pima County Fed. Emp. Credit." This work order was signed by plaintiff, as purchaser, and by Leon, as salesman. It was "Accepted" by the signature of John Keal, defendant's new car manager.

As a part of the same transaction, and at the same time, plaintiff and the salesman signed a conditional sales agreement, which was also signed by Keal. It described the Mustang, acknowledged its delivery to plaintiff, reserved the title in the dealer, and contained plaintiff's promise to make the payment due on March 24.

Ordinarily, if a car is purchased for cash, is ready for delivery, and involves no financing, none of these documents would be needed. The price would be paid when the car was delivered. Where, as here, there is to be a delayed payment, but no installments or financing, the conditional sales agreement would suffice, and the "work order" would be superfluous. Where the car is not ready, has not yet arrived on the dealer's lot, or is to be financed, the work order operates as an offer to buy, and it makes good sense for it to provide that the sale is contingent upon obtaining the necessary loan. Where, as here, the car was on the lot, was selected by the buyer, and—in Leon's language—it "had already been serviced except for connecting the speedometer", the conditional sales contract, reserving title would have sufficed. However, both documents were executed. *Plaintiff states that they were signed at the same time, and this is not contradicted by defendant.*

Plaintiff testified that she expected to drive her old car home and to keep it until she got her credit union to approve the loan. However, she was told that it was O.K. to take the new car then, and she did so, leaving her old car as the trade-in. If a customer can be persuaded to drive the new car away, he cannot come back the

next day and say that he has changed his mind and wants to return the car. If he does, the salesman simply tells him that the car has been used and is no longer saleable as a new car. Leon admitted this when he testified that he earned no commission until the sale was completed and the car was driven away, and that this ploy is known in the trade as "getting the car over the curb." In any event, plaintiff discovered, a few days later, that the credit union would not make the loan to her. She then returned to the dealer and asked permission to return the new car and receive her old car back. The dealer rejected this idea, and when the payment date passed, plaintiff was in default and the new car was repossessed. She then brought suit in three counts, for conversion of her old car, misrepresentation, and fraud.

■ Normally one would not expect a dealer to sell and *deliver* a new car to a person in plaintiff's financial condition, except for cash, or a down-payment large enough to prevent a loss if the car has to be repossessed. Leon testified that that decision was not his to make—that it was made by Keal. It is understandable that Keal, on looking at the conditional sales contract, concluded that the trade-in was a sufficient down-payment to protect the company in event of a default, since payment of the balance was due in a lump sum in a few days, and title to the car was retained. If the conditional sales contract were the whole contract, there would be no problem. But the work order was signed by both parties as a part of the same deal. The two documents, therefore must be considered together as constituting the contract between the parties. Smith v. Superior Equipment Company, 102 Ariz. 320, 428 P.2d 998. We think it is obvious that the *seller's new car manager* intended a binding contract. The buyer, however, states, without contradiction, that *she* intended it to be binding only if the credit union would finance the car, as she had no other way of paying for it. The whole affair was somewhat mixed up, and the trial judge was understandably confused. He heard arguments on the defendant's motion for judgment, and made the following observations:

"* * * I have never heard of a car dealer giving the privilege of someone taking a car, and if you can't make out, bring it back to us. Nobody ever gave me that kind of a deal."

\* \* \* \* \* \*

"I find it hard to believe, under the circumstances and facts that I have heard, plus my own relatively small experience in buying new cars, that anybody would sell a new car and hand it to somebody on the basis, now go ahead and take it, and if you can't get financing, bring it back to us * * * this is the craziest case I have seen in a long time * * * I am not, in granting the motion, condoning this type of arrangement. I think this was, maybe some business judgment only, but seems to me like if it's a real—I would be concerned if I thought that a car dealer was selling cars in this manner just to get the trade-in * * * My basic common sense * * * seems to me like the worst I could find here is that they had no meeting of the minds."

This Court takes a liberal view of the use of judicial notice, but for a trial court to decide that a deal probably was not made, merely because "Nobody ever gave me that kind of a deal," carries the doctrine too far. It is obvious that it was contemplated by the dealer that some cars would be delivered before financing was confirmed. Were this not so, there would have been no point in putting in the work order, a statement that if the loan application is rejected, the buyer must return the car.

However, the question is not whether the dealer *intended* to give the buyer the privilege of getting out of her promise to pay when the loan was refused; the real question is whether plaintiff was justified in construing the documents that way when she signed them. It is what the contracts say, which counts—not what the preparer

of them intended. Allied Steel & Conveyors, Inc. v. Ford Motor Company, 277 F. 2d 907 (6th Circ. 1960).

The trial court granted defendant's motion for judgment, and subsequently made the following four findings of fact:

1. That plaintiff and defendant entered into a conditional sales contract for the Mustang.

2. That the terms of the conditional sales contract are clear and unambiguous.

3. That plaintiff breached its terms by failing to make her payment.

4. That defendant made no false representations and did not fraudulently scheme to get plaintiff's old Chevrolet from her.

■■ Defendant argues that an appellate court must accept a trial court's findings if there is adequate evidence to support them. This is true. The rule is founded upon the theory that the trial court, having seen and heard the witnesses, is in a better position to determine their honesty and accuracy than the higher court. For this reason, where there was some conflict in the evidence, as at this trial, the lower court's finding will be accepted. Such is the case with finding No. 4; therefore, the two counts of plaintiff's complaint charging fraud and misrepresentation were properly adjudicated in favor of defendant.

■ However, on the authority of Smith, supra, as previously stated, the conditional sales agreement and the work order must be read together. It follows that the deal was contingent upon the obtaining of a loan from the credit union, or the parties never agreed upon the terms of the sale. In either case there was no contract, and the dealer owed plaintiff the duty to return her car when she returned the new Mustang. It follows that defendant's refusal to return the car to plaintiff was a conversion.

This is not contradictory to the rule that the trial court's findings are to be upheld where evidence supports them. The problem is more closely related to the situation in LeBaron v. Crismon, 100 Ariz. 206, 412 P.2d 705 in which we said:

"This court has held that the agreement need not be contained in one paper but may be in several so long as they can be identified with reasonable certainty * * * An interpretation of the instruments is a question of law to be determined by this court independent of the trial court's findings."

The evidence shows that the "Blue Book" value of plaintiff's car was between $450 and $735, and that defendant allowed her $325 for it in trade. It will be necessary to determine the market value of the plaintiff's '63 Chevrolet at the time and place of the conversion, and to enter judgment for the plaintiff in that amount, plus interest from April 1, 1968.

At the trial defendant's attorney assured the judge that no attempt would be made to collect any deficiency in connection with the repossession of the Mustang. It is intended that the judgment for the plaintiff, required by this opinion, shall not be offset or nullified by any such attempt.

Reversed and remanded for the purpose of hearing evidence solely on the issue of the value of the Chevrolet.

LOCKWOOD, V. C. J., and STRUCKMEYER, McFARLAND and HAYS, JJ., concur.