OPINION
SULT, Judge.
¶ 1 In this opinion, we determine whether ownership of a vehicle had passed from Ap-pellee Childress Buick to the prospective buyer of the vehicle at the time Appellant Richard O’Connell rear-ended the vehicle with the buyer in possession pursuant to an attempted, but ultimately unsuccessful, purchase of the vehicle. In determining that ownership had not passed and that O’Con-nells’ insurer was therefore wrong in paying the prospective buyer and not Childress for the vehicle damage, we decide that Cavazos v. Holmes Tuttle Broadway Ford, Inc., 104 Ariz. 540, 456 P.2d 910 (1969), is the controlling precedent, not Heltzel v. Mecham Pontiac, 152 Ariz. 58, 730 P.2d 235 (1986), upon which O’Connells rely. We accordingly affirm the trial court’s grant of summary judgment to Childress.
BACKGROUND
¶ 2 On July 26, 1996, Childress agreed to sell a used 1995 Buick Skylark to Shawn Clark. To confirm the transaction, Childress and Clark executed two documents on that date, a “Car Purchase Agreement” and an “Arizona Motor Vehicle Sales Contract and Disclosure Statement.” Childress then issued a temporary registration plate to Clark that designated him as “owner” of the vehicle, had Clark sign an application for an Arizona certificate of title, and gave Clark possession of the Buick. Clark obtained insurance on the vehicle.
¶ 3 The Purchase Agreement refers to itself as “the order” and includes a provision that the “Order is not binding on Seller until accepted in writing by officer, or Sales-manager of Seller and until Purchaser’s credit has been approved.” (Emphasis added.) The accompanying Sales Contract contains no similar condition but rather deals primarily with installment financing for the purchase of the vehicle and the granting of a secured interest in the vehicle.
¶4 On the morning of July 28, Clark’s application for financing was disapproved. Childress’ finance director was unable to reach Clark at that time, but he did speak to Clark’s roommate and told him that Clark should return the vehicle immediately. That same day, Richard O’Connell rear-ended the Buick while Clark was driving it.
¶ 5 O’Connells were insured by Nationwide Mutual Insurance Company, and on July 30, Clark presented the Buick to Nationwide. Nationwide estimated the damage to the vehicle at $3,487.86 and thereupon issued a cheek to Clark in that amount. The record does not disclose what Clark did with the money, but we presume from the fact of this lawsuit that he did not pay it over to Chil-dress.
¶ 6 On July 31, Clark’s roommate returned the damaged vehicle to Childress. The next day, Childress notified Nationwide that it owned the vehicle and expected compensation for the damage caused by Nationwide’s insured. Nationwide rejected Childress’ demand.
¶ 7 Childress sued O’Connells seeking reimbursement for the amount it spent to repair the damage to the Buick. Following arbitration proceedings that culminated in a judgment for Childress, O’Connells appealed to superior court. The superior court granted summary judgment to Childress, awarding $4,383.07 in damages and $600 in attorneys’ fees. O’Connells timely appealed to this court.
*456 ANALYSIS
¶ 8 O’Connells recognize that they can avoid liability only by establishing either that the contingency in the Purchase Agreement requiring approval of a purchaser’s credit did not apply to this transaction or, if applicable, that it nevertheless did not preclude transfer of ownership of the vehicle to Clark. To this end, O’Connells first argue that the entire Purchase Agreement simply does not apply because the Sales Contract contained every term necessary to accomplish a sale of the vehicle and therefore superseded the Purchase Agreement. Because transfer of ownership under the Sales Contract was not conditioned on approval of the purchaser’s credit, O’Connells contend, the execution of that document by the parties together with the transfer of possession of the vehicle to Clark effectively made him the owner. O’Connells explain the Purchase Agreement simply as an order placed by the customer for the eventual purchase of a vehicle, usually a new vehicle from the manufacturer. Here, however, the vehicle being “ordered” was a used vehicle already on Childress’ lot. Because of this, O’Connells conclude, the Purchase Agreement was immediately performed upon its execution and thereafter became mere surplusage.
¶ 9 Instructive here is the principle that substantially contemporaneous documents are to be read together to determine the nature of the transaction. Realty Associates of Sedona v. Valley National Bank of Arizona, 158 Ariz. 514, 518, 738 P.2d 1121, 1125 (App.1986). Cavazos is a particularly relevant illustration of this principle, because it involved similar documentation, including a “work order” containing a credit approval provision and a separate conditional sales contract. 104 Ariz. at 542, 456 P.2d at 912. The Cavazos court stated that the two documents “must be considered together as constituting the contract between the parties.” Id.
¶ 10 Applying these authorities, we read the documents in this case not as separate and sequential contracts with the Purchase Agreement being completely performed and the Sales Contract becoming the exclusive controlling agreement, but rather as two parts of one contract. Together, the documents appear to complement each other, whereas standing alone neither document contains all the provisions necessary for an installment sale on credit. The Purchase Agreement contains a listing of taxes and fees that are added to the price of the vehicle, the odometer disclosure statement, warranty statements, and the provision that the order is not binding on the seller until the purchaser’s credit has been approved. The Sales Contract deals primarily with that information necessary to a credit sale, disclosing financing information such as the annual percentage rate, total finance charge, and total of payments over the life of the loan. It gives the buyer the opportunity to obtain credit life insurance, grants a security interest in the vehicle to the lender, and requires the buyer to maintain insurance coverage on the financed vehicle.
¶ 11 Both documents are pertinent to a transaction such as the one contemplated between Childress and Clark. Reading the documents together, we find both are part of the agreement between Childress and Clark. We therefore reject O’Connells’ first argument that the contingency regarding approval of purchaser’s credit is irrelevant because the document in which it is contained, the Purchase Agreement, was superseded by the later document, the Sales Contract.
¶ 12 O’Connells next argue that if the Purchase Agreement with its contingency is a part of this transaction, the contingency nevertheless did not operate to preclude transfer of ownership because Heltzel dictates that conclusion. Childress responds that Cavazos is the controlling precedent and that it requires that we find no such transfer occurred. We now turn to an analysis of these cases.
¶ 13 In Cavazos, the first of the two documents executed by the purchaser and car dealer, the work order, contained a provision that the purchase would be subject to “Finance Company or Bank approval.” 104 Ariz. at 541, 456 P.2d at 911. The purchaser sought financing from her own credit union, and the dealer gave her possession of the new car pending financing approval and ac *457 cepted her old ear as a trade-in. Id. When the credit application was rejected and the purchaser tried to return the new car and retrieve the old one, the dealer refused, asserting that the sale had been completed via the second document, a conditional sales contract, and the purchaser was obligated to pay for the new car pursuant to that agreement. Id. at 542, 456 P.2d at 912.
¶ 14 The purchaser sued in tort for conversion of her old car and the dealer pled the contract as a defense, alleging that it controlled the obligations of the parties and that the dealer was entitled under the contract to sell the old car. Id. After finding that the contract between the parties encompassed both documents, the supreme court rejected the dealer’s argument, concluding that the provision in the work order requiring credit approval made any contract contingent upon the purchaser obtaining a loan or, alternatively, the parties never agreed on the terms of a contract. Id. at 543, 456 P.2d at 913. The court then held that “[i]n either case there was no contract.” Id. Therefore, the court concluded, the dealer’s sale of the old car was a conversion and the purchaser could maintain an action in tort for that act. Id.
¶ 15 O’Connells argue against the application of Cavazos, urging instead that Heltzel controls the outcome here. In Heltzel, the purchaser wanted to buy a new vehicle, using her old vehicle as a trade-in and paying the balance in installments. 152 Ariz. at 59, 730 P.2d at 236. She executed a “purchase order” that had a credit approval condition similar to the one here and in Cavazos. Id. The dealer later falsely informed her and her co-signer that her credit had been approved and consequently she executed a retail installment sales contract, signed over the title to her old car, and took possession of the new vehicle. Id.
¶ 16 A few days later, the dealer sold her old car only to learn later that same day that the credit application had been turned down. Id. The dealer then informed the purchaser of the denial of credit and told her she would have to return the new car if she could not get alternate financing. Id. at 60, 730 P.2d at 237. However, the dealer did not wait to see if new financing could be obtained but repossessed the car the next day. Id. The purchaser sued both in contract for breach of the sales agreement and in tort for conversion of the new car, and was awarded compensatory and punitive damages by the jury. Id.
¶ 17 On appeal, the dealer contended that no contract had been formed because the purchase order contained conditions to formation of a contract that had not been satisfied, presumably referring to the credit approval provision. Id. The supreme court responded that the purchaser was justified in viewing the purchase order and installment sale document together as creating a binding contract, citing Cavazos, and then stated,
Heltzel complied fully by paying her deposits to Mecham Pontiac. She had obligations under that contract but it was a contract nevertheless and, at the time of repossession of the Trans-Am, she was not in default under the contract.
Id. (emphasis added). The court did not comment further on this topic but rather, after extensive analysis, decided the case on the basis that even if there was not a contract, the dealer was equitably estopped from denying the existence of one. Id. at 60-61, 730 P.2d at 237-38.
¶ 18 O’Connells urge that the quoted language from Heltzel in effect overrules Cava-zos and therefore the inclusion of a credit approval contingency in the Purchase Agreement here did not prevent the formation of a contract that passed ownership of the vehicle to Clark. We agree with O’Connells that Heltzel and Cavazos appear factually indistinguishable and that the language in Heltzel pronouncing the existence of a contract notwithstanding the inclusion of the contingency requiring prior credit approval appears to be at odds with the finding of Cavazos on the same subject. However, we are unable to agree with O’Connells that Heltzel intended to overrule Cavazos.
¶ 19 The Heltzel court made it clear at the beginning of its opinion that it had granted review on only one issue “and that is whether, under the facts of this case, the seller is estopped from denying the existence of a contract for the sale of an automobile.” Id. *458 at 59, 730 P.2d at 236. The bulk of the court’s opinion was devoted to analyzing this issue and the holding of the case essentially was that the dealer was indeed estopped. The court’s language regarding the existence of a contract, on which O’Connells rely, was gratuitous and unnecessary to its holding on the estoppel issue, the issue on which the case turned. It was therefore dictum. Creach v. Angulo, 186 Ariz. 548, 552, 925 P.2d 689, 692 (App.1996), approved, 189 Ariz. 212, 213-14, 941 P.2d 224, 225-26, (1997).
¶20 We are unwilling to utilize dictum from one supreme court opinion to infer that an earlier precedent from that same court has been overruled. This would be particularly inappropriate when the prior precedent is cited favorably in the later case, albeit for another proposition. If our highest court intends to abandon a long-standing rule, we believe it will give a clearer signal of that intent than is provided by Heltzel. Therefore, we will apply Cavazos.
¶ 21 We see no distinguishing features between our ease and Cavazos. Just as the credit approval contingency in Cavazos precluded formation of that contract, so too in this case no contract for sale was formed unless and until Clark’s credit was approved. Only then could an ownership interest pass to Clark that would justify payment to him of the insurance proceeds. Because ownership never transferred, Childress was the party to whom the payment for the damage to the vehicle should have been made.
¶22 O’Connells offer an alternative argument that they contend avoids the Cavazos/Heltzel dispute entirely. They argue that notwithstanding the transaction documents, Clark owned the vehicle pursuant to Arizona Revised Statutes Annotated (“A.R.S.”) section 28-101(40)(Supp.l995),[1] which defined “owner” as follows:
In this title [Title 28], unless the context otherwise requires: ■
“Owner” means a person who holds the legal title of a vehicle or, if a vehicle is subject of an agreement for the conditional sale or lease with the right of purchase upon performance of the conditions stated in the agreement and with an immediate right of possession vested in the conditional vendee or lessee, the conditional vendee or lessee ...
¶ 23 We see at least two reasons why this statute does not assist O’Connells. First, the definition applies only within the context of Title 28 of the Arizona Revised Statutes. Faz v. Ford Motor Credit Co., 191 Ariz. 191, 193, 953 P.2d 935, 937 (App.1997). It does not apply, for example, to define ownership for purposes of ascertaining the proper payee under an insurance policy. St. Paul Fire & Marine Insurance Co. v. Muniz, 19 Ariz.App. 5, 7, 504 P.2d 546, 548 (1972)(“ownership” as defined in the insurance contract, rather than statutory definition of “owner,” controlled to determine coverage). Nowhere in this case is Title 28 implicated and therefore definitions from that Title are irrelevant.
¶24 Second, even if this statutory definition were material, its application would depend on whether Clark was “vested with an immediate right of possession.” A.R.S. § 28-101(40). While he was allowed to take possession and drive the ear away from the lot, we see nothing in the documents that would vest him with a “right” to possession, as opposed to merely being a permissive user. O’Connells have not demonstrated any such right and we conclude none existed.
¶ 25 O’Connells cite a North Carolina case, Roseboro Ford, Inc. v. Bass, 77 N.C.App. 363, 335 S.E.2d 214 (1985), that has facts similar to those before us and lends support to the arguments made by O’Connells. In Roseboro Ford, Bass, the purchaser, made a cash down payment, agreed to the sales price and terms, and the salesman allowed him to take the car pending arrangement of satisfactory financing. Id. at 215. Bass obtained insurance on the vehicle, but before financing was arranged, the vehicle was extensively damaged in a one-car accident. Id. In determining whether Bass’ insurer would have to pay under the collision coverage provision, the court held that Bass was the owner of the *459 vehicle under the North Carolina statutory definition of “owner,” which is similar to Arizona’s definition in Title 28. Id. at 216.
¶ 26 Notwithstanding the factual similarity, we do not find Roseboro Ford persuasive. We first note that while the North Carolina court applied that state’s statutory definition of “owner” to reach its holding, we have determined that Arizona’s statutory definition does not apply in this context. Second, in Roseboro Ford the sale of the vehicle apparently was not contingent on approval of the buyer’s credit. In contrast, the agreement between Childress and Clark was so conditioned, a fact that is pivotal to the outcome of this case. Therefore, although the facts in Roseboro Ford are somewhat similar, there is a crucial factual difference as well as differences in legal authorities that make its holding inapplicable.[2]
THE DISSENT
¶ 27 Our dissenting colleague proposes that we should decide the case on the issue whether Nationwide acted reasonably in paying Clark for the damage to the vehicle. We are not clear whether the dissent is making an equitable estoppel argument or proposes a negligence analysis. What we are clear about, however, is that no matter how the issue is denominated, it has not been raised in this appeal.
¶28 The dissent reviews the summary judgment pleadings below and, although acknowledging that the cross-motions focused on ownership of the vehicle, nevertheless construes particular passages therefrom as raising the “reasonableness of payment” issue before the trial court. We read the same passages in context with the entire summary judgment pleadings and conclude that the issue being argued was ownership and nothing else. But this disagreement is irrelevant. This is because, regardless of what was argued below, it is undisputed that the issue was not presented, argued, or in any way alluded to in the parties’ briefs in this appeal.
¶29 Our policy, and the policy of most appellate courts, is that issues not clearly raised in appellate briefs are deemed waived. Schabel v. Deer Valley Unified School District, 186 Ariz. 161, 167, 920 P.2d 41, 47 (App.1996). This is a wise policy of judicial restraint, based on the notion that it would be unfair to the parties to have the appellate court surprise them by deciding their case on an issue they did not present and may well have intentionally decided not to present. Moreover, this policy restrains the court from branching off on its own and deciding cases with no research assistance or analytical input from the parties.
¶ 30 We have adhered to the policy in this majority opinion. The parties posed the only dispositive issue as being “who owned the car at the time payment was made.” We decide the case on this issue, as the parties clearly intended that we do.[3]
CONCLUSION
¶31 We agree with the trial court that Clark did not own the vehicle at the time it was damaged and therefore was not entitled to payment from O’Connells’ insurer. Ae- *460 cordingly, we affirm the judgment in favor of Childress.
CONCURRING: JON W. THOMPSON, Judge.

. In 1997, A.R.S. section 28-101(40) was amended and renumbered as section 28-101(36), but no material changes were made to the text. 1997 Ariz. Sess. Laws, ch. 292, § 2. The version cited herein is the version in effect at the time of the transaction.

. O’Connells also raise arguments under Uniform Commercial Code provisions that (1) Chil-dress’ retention of the vehicle’s title certificate did not prevent title from passing to Clark once the car was delivered to him, (2) Clark owned the vehicle because he had "power to transfer good title to a good faith purchaser for value” even if he obtained possession of the vehicle by fraud, and (3) Childress had at best an unrecorded security interest in the vehicle at the time of the accident, not an ownership interest. O’Connells also argue that any security interest created by retention of the title certificate was invalid to give notice to third parties, tortfeasors are not deemed to have notice of recorded security interests, and Nationwide’s settlement with Clark barred any further claims by anyone else claiming an interest in the vehicle. None of these issues were raised below either in arbitration or before the superior court. On appeal from summary judgment, a party may not advance new theories or raise new issues to attempt to secure a reversal. Lansford v. Harris, 174 Ariz. 413, 419, 850 P.2d 126, 132 (App.1992). We therefore decline to address these issues.

. We are compelled to note in passing, however, that contrary to the dissent’s assertion, our analysis does not imply that "an insurer pays a routine claim at its peril unless it obtains and properly interprets lengthy and ambiguous sales contracts.” Infra ¶ 36. Again, that issue is simply not before us.