NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

MARY JEAN M., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, E.L., *Appellees.*

No. 1 CA-JV 18-0055
FILED 9-11-2018

---

Appeal from the Superior Court in Mohave County
No. B8015JD201604027
The Honorable Rick A. Williams, Judge

**AFFIRMED**

---

COUNSEL

The Stavris Law Firm, PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Lauren J. Lowe
*Counsel for Appellee, Department of Child Safety*

---

## MEMORANDUM DECISION

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Jon W. Thompson and Judge James B. Morse Jr. joined.

---

**H O W E**, Judge:

¶1        Mary Jean M. ("Mother") appeals from the trial court's order terminating her parental rights to her son, E.L., on the ground of 15 months' time in an out-of-home placement. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2        Mother is the natural parent of M.L., born in May 2001, and E.L., born in May 2003. She lived with the children in or near Arizona for several years, while Donald L. ("Father") lived in another state.[1] Mother has a considerable medical history and has survived 11 strokes. Those strokes left her severely physically impaired; she could not prepare food, feed herself, hold utensils, speak clearly, or bathe on her own. Hence, she could not meet her own or the children's daily needs. Accordingly, at young ages, the children became her primary caretakers. E.L. unstintingly took on this caregiving role, doing most everything for Mother and often skipping school to care for her. Mother's only source of income came from child support, and she could not provide the children with a stable home. Just before the current dependency, they were living in various hotels and shelters.

¶3        In March 2016, while trying to light a cigarette, Mother burned herself severely. Upon her hospitalization for the burns, the Department of Child Safety took custody of the children because they had no legal caregiver supervising them. After her release from the hospital, Mother moved in with her sister in Pennsylvania who became her full-time caregiver.

¶4        Because of Mother's severe and seemingly static functional limitations, the Department asked her for medical documentation

---

[1]        The juvenile court terminated Father's parental rights, and he is not a party to this appeal. M.L. is in an independent-living program and is also not a party to this appeal.

explaining whether she could participate in services and whether services could restore her ability to parent the children. The Department never received this information and therefore only provided Mother with case-management services, team decision-making meetings, and visitation. The Department also believed that Mother had mental-health issues; it therefore asked her to enroll in behavioral-health services and to take a psychological evaluation if she could. Mother never did so, but she participated in regular telephonic visits with E.L. E.L. struggled with visits because, according to him, Mother was very difficult to understand on the phone due to her medical condition. He also expressed that he could not "handle" the calls when Mother would share the difficulties that she was going through, but he did not wish to stop talking to Mother altogether.

¶5            Meanwhile, by March 2017, Father had engaged in the case plan and the court returned the children to his custody. The next month, Mother visited E.L. once in person. Shortly after that, E.L. disclosed to Father that he had been sexually abused for several years by a family friend. E.L. also disclosed that he cared for the alleged perpetrator who had introduced E.L. to methamphetamine. The Department notified police, and they arrested the alleged perpetrator. Over the next few months, E.L. suffered from methamphetamine withdrawal and his mental health declined. In June, Father took him to the emergency room. E.L. required hospitalization, and the next day the Department took custody of him because Father refused to care for him any longer.

¶6            Upon E.L.'s release from the hospital, the Department placed him with a foster family while it arranged inpatient psychiatric care and other intensive support services for him. In October 2017, the Department moved to terminate Mother's parental rights on the 15 months' time in an out-of-home placement ground. Two months later, just before his support services began, E.L. ran away and remained missing for four months.

¶7            In January 2018, the court held a contested termination hearing. At the hearing, Mother's counsel conceded that "reunification is [not] possible with Mother. . . . [Her] medical condition is such that it continues to deteriorate. She's . . . been at the point for an extended period of time now where she's unable to parent." Likewise, the case manager testified that "Mom herself, needs someone to care for her. So, therefore, she's not able to care for anyone else[.]" She also testified that having been Mother's caregiver for much of his childhood, E.L. expressed a strong sense of guilt and responsibility towards her. She further testified that E.L. recognized that these feelings inhibited him from addressing his own extensive special needs. The case manager explained that without

termination of Mother's parental rights, E.L. would likely remain in foster care for three-and-a-half more years—until he turned 18—denying him any chance at progressing towards permanency. Next, the case manager testified that as soon as the Department located him, she was committed to doing "whatever we need to do to help him." The case manager anticipated placing E.L. in a facility that could holistically address his mental-health, sexual-abuse, and methamphetamine-addiction issues. She testified that the Department was already working on facilitating those intensive support services "so that once he is found we will be able to . . . help him."

¶8        Also during the hearing, Mother's counsel indicated that she had disclosed some medical information to the State, but the case manager testified that the Department did not receive it. Nevertheless, at the hearing, Mother conceded that her impairments were degenerative and that she could not parent E.L. The court found that continuing the parent-child relationship would harm E.L. because "it would delay permanency, leaving [him] to linger in [foster] care for an indeterminate period since [he] doe[s] not have parents who are able to care for him." The court later terminated Mother's parental rights on the ground alleged. Mother timely appealed. Two months after Mother initiated this appeal, the Department located E.L.

## DISCUSSION

¶9        Mother argues that the court erred by terminating her parental rights on the 15 months' time in an out-of-home placement ground. She also contends that insufficient evidence supports the court's finding that terminating her parental rights was in E.L.'s best interests. The court did not abuse its discretion in terminating Mother's parental rights because (1) Mother failed to challenge the Department's provisions of services, thereby waiving that argument on appeal; (2) sufficient evidence showed that Mother was incapable of exercising proper parental care and control in the near future; and (3) termination was in E.L.'s best interests.

¶10        A juvenile court's termination order is reviewed for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58 ¶ 9 (App. 2015). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002). This Court will accept the juvenile court's factual findings unless no reasonable evidence supports them and will affirm a termination order unless it is clearly erroneous. *Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 508 ¶ 1 (App. 2008).

**¶11**        To terminate parental rights, the juvenile court must find by clear and convincing evidence that at least one of the statutory grounds for termination exists and by a preponderance of the evidence that termination is in the child's best interests. *Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 286 ¶ 15 (App. 2016). As pertinent here, the juvenile court may terminate parental rights when (1) the Department made a diligent effort to provide appropriate reunification services, (2) the child has been in an out-of-home placement for a cumulative total period of 15 months or longer pursuant to court order, (3) the parent has been unable to remedy the circumstances that caused the child to be in an out-of-home placement, and (4) a substantial likelihood exists that the parent will be incapable of exercising proper and effective parental care and control in the near future. A.R.S. § 8–533(B)(8)(c). A parent's failure "to raise a timely objection if [she] believes services are inadequate" may waive such a claim on appeal. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 178 ¶ 13 (App. 2014).

### 1. Statutory Ground for Termination

**¶12**        Here, Mother did not raise any issues with services (or the lack thereof) at any time during the dependency proceedings or at the termination hearing. The case manager testified that although Mother had trouble speaking clearly, her attorney kept in regular contact with the Department for her. Mother therefore could have voiced any concerns about services through her counsel at the numerous dependency hearings that spanned almost two years; yet, she raised no issues. Nor did she request any additional services from the case manager. She also failed to ensure that the Department had received her medical documentation. Without it, the case manager could not assess what, if any, services would be appropriate for her given her severe functional limitations.[2] Finally, Mother did not raise any issues with services at the termination hearing

---

[2]        We note that the court never relieved the Department from its duty to provide services to Mother, and the Department did not seek a futility finding from the court at any time during the case. Nor did Mother "ask the . . . court to conduct a hearing to determine whether [the Department] could suspend services or refrain from providing them[.]" *See Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 236–37 ¶¶ 21–25 (App. 2011). Nevertheless, when the dependency began, Mother admitted that her severe functional limitations prevented her from parenting the children. Therefore, the Department's request that Mother provide medical documentation to assess what further services were appropriate for her was reasonable under these unique facts.

through cross-examination or argument. She has therefore waived her argument on appeal and we decline to address it further.

¶13    Mother also argues that insufficient evidence supports the court's findings that she was unable to remedy the circumstances that caused E.L. to be in an out-of-home placement and that a substantial likelihood exists that she will be incapable of exercising proper and effective parental care and control in the near future. Her argument consists of only two sentences and she provides no supportive record or legal citations. Because she failed to develop her argument, it is waived. *See* ARCAP 13(a)(7)(A) (stating that opening briefs must contain an "[a]ppellant's contentions concerning each issue presented for review, with supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which the appellate relies"); *see also Childress Buick Co. v. O'Connell*, 198 Ariz. 454, 459 ¶ 29 (App. 2000) (stating that "issues not clearly raised in appellate briefs are deemed waived"); *see also State v. Carver*, 160 Ariz. 167, 175 (1989) ("In Arizona, opening briefs must present significant arguments, supported by authority, setting forth an appellant's position on the issues raised. Failure to argue a claim usually constitutes abandonment and waiver of that claim.").

### 2. Best Interests

¶14    Mother next argues that insufficient evidence supported the court's finding that terminating her parental rights served E.L.'s best interests. Terminating parental rights is in a child's best interests if the child will benefit from the termination or will be harmed if the relationship continues. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4 (2016). Relevant factors in this determination include whether (1) the current placement is meeting the child's needs, (2) an adoption plan is in place, and (3) the child is adoptable. *Id.* at 3–4 ¶ 12.

¶15    Moreover, "[i]n a best interests inquiry . . . we can presume that the interests of the parent and child diverge because the court has already found the existence of one of the statutory grounds for termination by clear and convincing evidence." *Kent K. v. Bobby M.*, 210 Ariz. 279, 286 ¶ 35 (2005); *see also In re Maricopa Cty. Juv. Action No. JS–6831*, 155 Ariz. 556, 559 (App. 1988) ("In most cases, the presence of a statutory ground will have a negative effect on the children[,]" which supports a best interests finding.). Once a juvenile court finds that a parent is unfit, the focus shifts to the child's interests. *Kent K.*, 210 Ariz. at 285 ¶ 31, 287 ¶ 37. Thus, in considering best interests, the court must balance the unfit parent's "diluted" interest "against the independent and often adverse interests of

the child in a safe and stable home life." *Id.* at 286 ¶ 35. Of foremost concern in that regard is "protect[ing] a child's interest in stability and security." *Id.* at ¶ 34.

¶16        The juvenile court found that continuing the parent-child relationship would harm E.L. because it would delay permanency and cause him to stay in foster care for an indeterminate period. Reasonable evidence supports this finding. At the time of the termination hearing, E.L. had already spent two years in foster care, and Mother's condition had not improved. While Mother undoubtedly loves E.L. and shares a bond with him, nothing disputes that she could not meet his extensive needs at the time of the termination hearing and would be unable to do so in the near future. The record shows that throughout the dependency, Mother could not accomplish basic self-care tasks without a caregiver's assistance. Her inability to meet her own needs or E.L.'s did not improve during the dependency; if anything, her condition declined.

¶17        Mother's counsel conceded at the termination hearing that reunification was not possible with Mother because she was unable to parent due to her medical condition. Likewise, the case manager testified that Mother needed someone to care for her, and therefore could not care for anyone else. The case worker also noted that E.L. had expressed a strong sense of guilt and responsibility towards Mother, which kept him from addressing his own needs. Furthermore, the case manager testified that without termination of her parental rights, E.L. would likely remain in foster care until he became 18 years old, which would deny him any chance at permanency. As such, sufficient evidence supported the court's finding that termination of Mother's parental rights was in E.L.'s best interests.

## CONCLUSION

¶18        For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:  AA